IN RE JOSEPH M. NOONAN AND ALEXANDER SIMPSON, ATTORNEYS, &c.

Argued February 26th, 1900—Decided June 11, 1900.

Where alleged misconduct involves a criminal offence, the court will not disbar an attorney in advance of a conviction unless the evidence against him is clear and convincing.

On rules to show cause why respondents should not be disbarred.

Before Justices DIXON, LUDLOW and COLLINS.

For the rule, *Samuel H. Grey,* attorney-general.

*Contra, Thomas F. Noonan, Jr.,* for Joseph M. Noonan; *Alexander Simpson, in pro. pers.*

The opinion of the court was delivered by

COLLINS, J. The charge that the respondents were called on to meet was formulated by the Bar Association of Hudson county in rules to show cause why the respondents, respectively, should not be disbarred or suspended from practice, because of professional misconduct in the following respects:

"That one Nicodem Boczkowski, in December, 1897, at Jersey City, was in custody, upon an indictment, for a crime committed in the county of Hudson, to which he had pleaded guilty and was awaiting sentence.

"That Joseph M. Noonan, being an attorney of this court and assistant prosecutor of the pleas of said county, did then and there agree with Alexander Simpson, also an attorney of this court, and with persons professing to represent the friends of said prisoner, that said Simpson should act as attorney and counsel of said prisoner, and should apply to the court, in which said plea had been entered, for leave to withdraw it and plead not guilty; that said Noonan, as assistant prose-

cutor, would favor, or not oppose, said application, and, upon its being granted, would obtain leave and enter a *nolle prosequi* upon the indictment, and that three hundred dollars, or some other sum, should be paid to said Noonan and Simpson for the discharge of the said prisoner.

"That, in pursuance of said agreement, the said money was paid to said Noonan and Simpson, or one of them, and they proceeded to attempt to carry out the said agreement by appearing in court upon such application, but the further prosecution thereof was prevented by the announcement by the court that it had received information as to said agreement."

It will be perceived that the alleged professional misconduct involved a criminal conspiracy to commit acts for the perversion and obstruction of justice; and, in fact, the case shows that the respondents were, at the December Term, 1897, of the Hudson Oyer, indicted and tried for such a conspiracy. The result of the trial was not proved, but this court was informed by counsel at the argument that the jury disagreed, and that recently a *nolle prosequi* had been entered on the indictment.

While there is no inflexible rule that disbarment for a cause involving a criminal offence should be delayed until there has been a conviction of the offence, yet, if the evidence is conflicting and if reasonable doubt of guilt exists, no court should proceed summarily, but should leave the case to be determined by a jury. *Ex parte Wall,* 17 *Otto* 265.

The evidence adduced under the rules to show cause fails to convince us of the guilt of respondents. It appears that the proprietors of the Jersey City "Evening Journal" were led to suspect the possibility of malfeasance in the office of the prosecutor of the pleas; and, to test the matter, employed Louis J. Beck and Edward Pidgeon, newspapermen from New York City, to offer a decoy bribe to the assistant prosecutor, with the purpose of a public exposure if they were successful in inducing him to betray his trust. The case of Boczkowski, who had pleaded guilty to grand larceny and was then awaiting sentence, was selected for the experiment, and on December, 1897, Beck and Pidgeon called upon Mr. Noonan at the

prosecutor's office. Noonan had seen Beck but once before, and did not know his name. Pidgeon he had never seen. Beck refused to testify in the present proceeding, and is beyond the reach of process. Pidgeon testified in New York on January 2d, 1900, but had so far forgotten the occurrences of 1897 that, except as his memory was refreshed by reference to his testimony on the trial of the indictment in February, 1898, his testimony was too meager to be evidential. The chief actor in the drama and the main witness for the state on the prosecution of the indictment was Beck, whose testimony at that trial the learned attorney-general has not felt justified in offering in the present proceeding. As best we can gather up the threads of Pidgeon's imperfect story, it is that Noonan at once acceded to a proposition from his two callers, whose only credentials were their own references to persons whom he knew, that he should, for a pecuniary consideration, consent to a withdrawal of Boczkowski's plea of guilty, and afterwards enter a *nolle prosequi* on the indictment; that he suggested that Mr. Simpson should pose as the prisoner's counsel; that the corrupt bargain was concluded with both Noonan and Simpson at the hotel of one Buttner, in New York City, on the evening of December 2d, 1897, and that on the next day the consideration was paid.

The visit of December 1st and the meeting of December 2d are admitted by the respondents, but are put in a very different light. Noonan testifies that Beck and Pidgeon did call upon him, professedly representing friends of the prisoner, and seeking legitimate information as to what could be done in his behalf, and that he referred them to Simpson, who, he had learned, was the prisoner's counsel, and that nothing further occurred.

Upon the arraignment and plea of guilty of Boczkowski, which occurred November 26th, 1897, the prisoner was not represented by counsel, but Mr. James D. Manning, a reputable member of the bar, had afterwards stated to Noonan that he had been retained and was inadvertently absent when the plea was taken, and desired leave to withdraw it, as the prisoner did not understand English, and was really ignorant

of what he had done. Noonan testified that he learned later that Simpson had been brought into the case, and therefore referred Beck and Pidgeon to him. Simpson testifies that, in fact, he had been retainéd, and states circumstances in corroboration that might readily have been disproved if non-existent. If Simpson really was counsel for the prisoner, Noonan's reference to him was natural and not improper.

The respondent's explanation of the visit to New York is that, after the interview in the prosecutor's office, one of the two callers, in a conversation with Noonan, by telephone, proposed to meet Simpson, whom they had been unable to see in Jersey City, at dinner in a chop-house in New York. Noonan was asked to see Simpson and request him to go over, and was invited to make one of the party at dinner. He says that he saw Simpson and gave him the message, and, against his own inclination, agreed to go over with him, on his urging the necessity of an introduction and suggesting a visit to the theatre after Simpson's interview should be finished. Simpson's testimony is to the same effect.

The four met and dined together, and then went to the theatre, and afterwards to various drinking places and finally to Buttner's hotel, where the alleged corrupt agreement was made. Simpson testifies that at no time was there any suggestion of a conspiracy with Noonan, but that the whole conversation with him, to which Noonan paid little heed, was with reference to the possibility of successful defence if the plea should be withdrawn and the proper counsel fee to be paid. Buttner testified for the state on the trial of the indictment and on the prosecution of the present rules. He was put forward by Beck and Pidgeon as financially representing Boczkowski's friends, and was instructed to say that $300, and no more, could be raised. He was not informed of the purpose for which the money was to be used. In his testimony he includes Noonan in the negotiation, but, in a previous affidavit, he had deposed that Noonan took no part in any conversation relating to money. Simpson denies that Noonan participated in the conversation with Buttner, which, he says, resulted in an agreement for a fee of $500, of which

he should receive $300 before moving in the matter. It is clear from the testimony that Noonan was so befuddled with drink as to leave it at least doubtful that he had an intelligent comprehension of what occurred at Buttner's. On December 3d, 1897, in the afternoon, Beck and Pidgeon came to Simpson's office, in Jersey City, and paid to some one $300, furnished for the purpose by the proprietors of the "Evening Journal." Pidgeon says that this money was a bribe. Simpson says it was his fee. Pidgeon says that the money was paid Noonan. Simpson says that he received and retained it. He certainly gave his own written receipt for it, but that, of course, may have been a mere cover; and a suspicious circumstance is that this receipt is post-dated. Noonan was present when the money was paid, but it is proved that he was taken to the office by Beck, who found him drinking in a neighboring saloon, where he had before ineffectually sent for him. The weight of the evidence is that Noonan was in a maudlin state, which fact alone can account for his permitting himself to be drawn into an affair that did not concern him. He fails to remember what occurred, but denies receiving any money.

There is much detail in the testimony of Pidgeon and Buttner, on the one hand, and the respondents, on the other, that it would be fruitless to discuss. The salient points I have, I think, fully presented.

There are two possible theories of this case—one that Pidgeon's story is substantially true, and the other that, desiring not to disappoint their employers and to figure in a sensational exposure, Beck and Pidgeon falsified or perverted their interviews with Noonan, their version being rendered plausible by his equivocal conduct induced by his drunkenness. Either theory presents difficulties. Beck's refusal to testify and Pidgeon's imperfect knowledge of all that occurred and incomplete memory of that which he did know, give the respondents an advantage, for the burden of proof is not upon their shoulders. A touchstone of the truth should be afforded by the conduct of the Boczkowski case, by Noonan, as assistant prosecutor of the pleas, after the alleged corrupt

agreement. Recognizing this, the attorney-general has examined Mr. Manning, as a witness, and has gleaned from him his impression that Noonan's attitude towards his request for leave for the prisoner to withdraw his plea underwent a change. It seems that, after the request was first made, Noonan sent Manning a message, by Manning's clerk, that he would like to see him—the clerk says privately—but Manning did not get the message. The clerk is now uncertain as to the date of this message, but on the trial of the indictment he fixed it as either the 29th or 30th of November. As Noonon did not meet Beck and Pidgeon until December 1st, a message as early as November 30th could not have been prompted by the alleged conspiracy. It must have been due to a wish to help a brother lawyer out of a difficulty; and Noonan, in fact, testifies that, for a while after Manning's first speaking to him, he was willing that the plea should be withdrawn, if the court had no objection, and therefore sent for Manning to tell him so. He sent again, and Manning called on the *morning* of December 3d. There was no attempt at privacy in the interview, for the clerk of the grand jury, who happened to be present, remained and heard it, and the door was open to the outer public room. On this occasion, according to Manning, Noonan "intimated" that he would have no objection to the case being opened, and also told him to look out for his fee, because "they" or "he" (meaning the prisoner or his friends) had plenty of money. Later, he told the witness that Mr. Simpson was in the case. It seems to me that these communications to Manning are inconsistent with a secret criminal conspiracy to release the prisoner. If such a conspiracy existed, it would have been Noonan's policy to ignore Mr. Manning, and certainly not to acquaint him with the fact that the prisoner's friends had money. He would not wish Manning to know that he had knowledge of that fact, and he would not have sought an interview with him before his own bribe had been paid. On the other hand, if Simpson had been retained and was to get a fee, it would have been both natural and considerate to treat Manning exactly as Noonan treated him. In fact, Manning thereafter

associated himself with Simpson, and they appeared together in the prisoner's behalf.

The controlling testimony on this subject, however, is that of Robert S. Hudspeth, who, at the time of the occurrences in controversy, was the judge of the Court of General Sessions, in which the Boczkowski indictment was pending. Manning and Simpson came before him, on December 9th, to request that the prisoner might withdraw his plea. He directed them to make a formal motion in open court the next day, which they did. On that day he laid the matter over until the 13th, which was Monday, and in the meantime, on Saturday, the 11th, the "Evening Journal" published its exposure of the alleged conspiracy. It will at once be seen that Judge Hudspeth would naturally bring to mind and remember the attitude of Noonan when the case was moved before him; and respondents rightly lay stress upon his testimony with respect thereto. It appears in the case that they wished to call the judge as a witness on the trial of the indictment against them in the Hudson Oyer, but as the law then stood he was necessary to the constitution of the court, and sooner than have an indefinite postponement of the trial, his testimony in that cause was waived. When called by the respondents in these proceedings, he testified that to him Mr. Noonan opposed granting permission for Boczkowski to withdraw his plea of guilty. It appears that it was claimed that the prisoner's offence, if proved, was more properly embezzlement than larceny, and the judge thought that, before the plea to the existing indictment should be disturbed, one or more new indictments for embezzlement should be found. He requested that bills should be framed and submitted to the grand jury. The final adjournment of that body, on December 10th, prevented that course. Judge Hudspeth is clear in his testimony that Mr. Noonan thought he could not prove embezzlement, and urged that the existing situation should not be changed. He recollects that on one of the two occasions when Manning and Simpson broached the subject, and during their argument, Noonan stepped up to the corner of the bench and said to him aside, "You have got this man, why don't you hold

him?" Mr. Manning admits in his testimony that, during the course of an argument, when he, with Mr. Simpson, moved for leave to withdraw Boczkowski's plea of guilty, Mr. Noonan stood at the right of the bench near the judge and held a conversation with him, which the witness, who stood at the other end of the bench, did not hear. Neither Judge Hudspeth nor Mr. Manning is sure whether this was on the 9th or the 10th of December, but it must have been on the 10th, for the only public appearance of Manning and Simpson in open court was on that day. It appears, then, that so far from attempting to carry out the alleged corrupt agreement and being prevented by the announcement of the court that it had received information of it, as the charge is framed in the rules to show cause, Mr. Noonan, up to the last presentation of the matter to the court, was advising against the very thing that it is alleged he had agreed to bring to pass. It may be argued that, having received his bribe in advance, he was simply seeking to save himself trouble and perhaps risk by secretly thwarting the purpose of those who bribed him, but this is an unreasonable theory, and it is far more likely that his refraining from open opposition to the motion was because he had too hastily intimated to Mr. Manning that he would not make objection to a course he afterwards saw was unwise for the state. He knew that if the court should not act, neither Manning or Simpson could reproach him, and therefore made no open opposition. Such an attitude is entirely credible, though not altogether creditable. Judge Hudspeth testifies that he was inclined to grant the motion, out of consideration for Mr. Manning, and Mr. Noonan's course is most readily explained on the assumption that he perceived and privately sought to turn that inclination.

We are unable to find satisfactory proof of the conspiracy recited in the rules to show cause, and they are therefore discharged.