JEFFERSON PLANTING & M'F'G. CO. **7520**

 VS. No. 7520.

MORGAN'S LA. & TEXAS RR. & S. S. CO.

May 14, 1919.

*Judge Dinkelspiel recused takes no part.*

338

CHARLES F. CLAIBORNE, JUDGE.

This is a damage suit for running over and killing mules.
The plaintiffs allege that they are the owners of the
Willswood Plantation situated in the Parish of Jefferson upon
which they raise sugar cane; that the tracks of the defendant
company run for several miles through their plantation; that
their refinery is situated upon one side of said tracks and upon
the other side of said tracks are the "Negro Quarters"; that
there is a public road leading from the refinery to the quarters
and that said road crosses defendant's tracks; that this crossing
is much used by plaintiffs' employees at all times of the day in
going to and from the fields and refinery to the quarters, espec-
ially during the grinding season in October, November, and Decem-
ber; that defendant's employees were aware of that fact, or should
have known it, and that, for that reason, they were in the habit
of slowing down their drains and blowing the whistle, or ringing
the bell for this crossing; that on November 11th, 1917, while
one of plaintiffs' employees was in the act of driving a cane
cart drawn by three mules across said track, one of defendant's
fast passenger trains ran into said cart and mules, completely
demolishing the cart and killing the three mules; that before
plaintiffs' employee attempted to cross defendant's tracks, he
stopped, looked, and listened, and neither seeing nor hearing
the said train approaching he proceeded to cross the track; that
defendant's passenger trains are noted for the lack of noise
while in motion, and that it is almost impossible to hear them
more than 100 feet away; that this train was two hours behind
time, and was running extra fast in order to make up time; that
the plaintiffs' employees in no manner contributed to the accident,
but that it was caused solely through the gross negligence of
defendant's company in failing to give any warning of the approach

*of* the train to said crossing; that the plaintiffs were damaged to the amount of $850 by the killing of said three mules, and to the amount of $75 by the loss of the cane cart.

The defendant denies the following allegations of the petition: that the crossing was being constantly used or that its employees knew it; that the driver of plaintiffs' cart stopped, looked, and listened; that its trains are noted for lack of noise while in motion, or that it is impossible to hear a train beyond 100 feet; that it negligently ran over the mules and cart; that its train was two hours late or that it was running extra fast to make up lost time; or that it was the custom of its employees to slow down for said crossing; it admits the killing of the three mules and the demolishing of the cart, but avers: that the train was composed of an engine, a tender and seven cars, and at the time of the accident was running at a speed not exceeding 18 miles an hour; and after striking said cart, was brought to a full stop within its own length; that it was the custom of its employees to blow the whistle and ring the bell for said crossing, and that the whistle was blown and the bell was rung for the said crossing; but that plaintiffs' employee who was driving the said cart was a young inexperienced, and careless boy who did not stop, look, and listen for the approach of the train, but was watching another train then running on the Texas and Pacific railway track, and was thereby guilty of contributory negligence which was the proximate cause of the accident; that before and at the time of the accident there was such a dense fog that the employees of defendant could not see the mules and cart approaching the crossing or on the track within a sufficient distance to have stopped the train and avoided the accident.

There was judgment in favor of plaintiff and defendant has appealed.

The Judge of the District Court found that the driver of the cart stopped, looked, and listened; that he neither heard the train approaching nor any whistle or bell, and that he was proceeding to cross the tracks when the mules were struck as they reached the middle of the track; he found that the speed of the train was excessive on a foggy morning, and he doubted that proper signals of the approaching train had been given.

340

The questions presented therefore are:

1o. Did the driver of the cart stop, look, and listen before proceeding to cross the track, and if he had done so, would he have been able to see or hear the train coming?.

2o. Was the train running at an excessive rate of speed? and

3o Did the engineer of the train give signals of his approach by blowing his whistle or ringing his bell?

The plaintiffs' witnesses testified as follows:

Israel Wright, the driver of the unfortunate cart was 21 years of age on January 1918; has been living on the Willswood Plantation for ten years, and has been driving mules nine years; first drove the water cart; drove the three mules cart for about seven years; was driving the cart on the morning of the accident; he was driving from the rear to the front; the first tracks to cross are those of the Southern Pacific (or Morgan's La. & Texas RRd) the defendant herein, which ran into him; Gould Casimere and three women were in the cart with him, and one Melville or Albert Carter, a brakeman, was standing on the Southern Pacific crossing; before he drove on the track he stopped on the woodside of the track; he was going toward the river; he "looked up the track and he looked down the track"; he "didn't see nothing at all"; the brakeman, Albert Carter, told him to stop there and look;

Q. Did you stop and look?

A. Yes, sir.

Q. Did you listen?

Question objected to as leading and objection sustained.

Q. You have said that you stopped and looked?

A. Yes, sir, I did.

Q. Did you do anything else when you stopped and looked?

A. I stopped and looked.

Q. Did you do anything else?

A. No, sir, I did not.

Q. Did you pay any attention?

A. Did I pay any attention?

Q. Yes.

341

A. I stopped and looked to see whether the train was coming. I had to pay attention after I stopped and looked.

Q. What attention did you **pay?**

A. I paid attention to see if the train was coming.

Q. What do you mean by paying attention?

A. Well, if the train was coming I was listening to see if she was coming.

Q. Did you hear any train coming?

A. No, sir, I did not;.

he heard the whistle of the Texas Pacific when it was coming, and when it passed the crossing going to New Orleans; (the tracks of the Southern Pacific are parallel to the tracks of the Texas Pacific and are 97 feet apart); after the Texas Pacific passed he drove up on the track of the Southern Pacific, when the train ran into him; it killed the mules and knocked him and the cart into the gutter, and broke the cart;

Q. Did it knock you foolish?

A. Yes, sir.

Cross-examined:

it was nearly nine o'clock in the morning; it was "awful" foggy; he could not see at any distance on account of the fog; he could not see the train fifty feet off; he heard a whistle about ten minutes before the accident; it came from the Texas Pacific train; he did not say to any employee of the Southern Pacific that he heard a whistle a short time before the accident, but that he thought it came from the Texas Pacific;

Q. How far did that train go after it struck your mules and cart before it stopped?

By Mr. Prowell.

"I object to the question. The witness has testified that he was knocked foolish. How could he state how far the train went after the accident?" Objection overruled.

A. I could not exactly say. I could not tell.

Q. Why can't you tell?

A. I can't.

Q. Why?

A. Because I was knocked foolish.

Q. But you could talk, couldn't you? '

A. I could talk a little, yes, sir.

Mr. Landry spoke to him about the case; - he spoke to him also; he told him he was crippled and he wanted to know if he could not get something from the one who did the damage to him; he does not know where the three women are; they must be in Gretna somewhere; Carter was standing on the East side of the crossing; the two tracks are about 20 feet apart; or the length of this room, 65 feet: the Texas Pacific passed about four minutes before; he is still working on the Willswood Plantation; he cannot say in what year he was born, because he does not have his card, upon which his age is marked; he has it home; he looked for it this morning but could not find it; he will send it to Court; it was an hour after the accident before he came to his senses; he could understand a little but not all; he was knocked senseless, but not clean out; after the accident he talked to a man who said to him he was the conductor; he was standing in his cart when he looked and listened; he neither saw nor heard a train coming; "no train blew after that T.& P. train"; nor did it ring a bell; the S. P. made a short blow after it struck him; Carter told him so; some of the whistles of the S. P. are the same as those of the T. P. and sound alike; he could not see the T. &. P. pass until the last coach went by; he could discern only the last coach.

Albert Carter was living on the Willswood Plantation in the fall of 1918; he was brakeman on a small train switching cane cars on the T. P. and the S. P.; he was on the crossing to see if the track was clear so he could cross with his engine;

Q. Where were you on Sunday morning of last November when a Southern Pacific train ran into a cart and killed three mules.

A. I was fifteen feet from the track of the S. P.; the cane cart stopped where I was standing about 15 feet from the track. I told him when he drove up to wait and let me go and look.

Q. Who was driving that cart?

A. This boy Israel Wright. I told him to wait and let me go and look. I went on the track and I heard the T. P. train blow and I said "there is something coming now, hold up", and he checked up his team; the T. P. passed going to the City -;

343

the T. P. train passed over the crossing completely before
Wright started to cross over the S. P. track.

Q. Did you hear any other train coming after the T. & P.
had passed?

A. No. sir, I did not hear any.

Q. Did you hear any other bell ringing?

A. No. sir.

Q. You were standing right by the T. & P. track?

A. About fifteen feet.

Q. Now you are positive you heard neither any bell or
whistle blow?

A. No, sir, I did not.

Q. What did Wright do after the T. & P. passed?

A. He was looking up and down the track.

Q. Up and down what?

A. The track.

Q. What track.

A. The S. P. track.

Q. And you told him to do what?

A. I called his attention. I said: "Wait, let me look;"
and at that time I went to look and I stepped back and said:
"All right, I think the track is clear". I did not see nothing";
and as he just drove up on the track it ran into him",-

when the train stopped, the last coach was about 100 feet
from the crossing; the train was going fast; he did not hear
that train blow its whistle; if it had blown any whistle he cer-
tainly would have heard it; he did not hear any bell ringing, if
any had been rung he certainly would have heard them;
cross- examined:

when he told Wright to wait, he had driven up a little bit and
"he was ten feet from the track at the time I told him"-; the
head of the mule was 10 or 12 feet from the track which would
have put Wright on top of his wagon, about 15 feet away; it was
awful foggy and he could not see beyond about 65 feet; it was
about five minutes after the T. P. had passed; the train was run-
ning very fast; the front end of the engine hit the cart; the
mules did not run into the engine; it was the T. P. cannon-ball;

the engineer, and firemen, and brakeman, and conductor came back to the crossing and talked with him and Gus Joseph;

Q. Didn't they talk to Israel Wright?

A. Israel Wright was out of his senses.

Gus Joseph was putting coal into a box about 110 feet from the S. P. road; he is no longer in the employ of the plaintiffs.

Gus Joseph was working for Mr. Landry in November, 1917; is no longer in his employ; on Sunday mornings he usually filled the coal box for the little engine; on the morning of the accident he was in the coal-yard loading a wheelbarrow at about 150 feet from the crossing; he saw the accident; he did not hear the train blow a whistle nor ring any bell; if they had, he was close enough to have heard it; it was a very foggy morning, one could hardly see 40 feet ahead; the conductor tried to make them say that the train blew its whistle, but they told him it did not; the crew of the train being shown to him he was unable to identify which one of them had told him so; the conductor being introduced to him, he cannot say that he ever saw him before.

Gould Casimere is 21 years of age; employed at Willswood in November 1917 and is still working there; on the morning of the accident he was in the cart with Israel Wright and three ladies; "they just were taking a little ride, that's all"; they were taking off the grinding at Willswood; he got his back hurt and was half crazy; Carter was at the crossing, and he told Wright to hold on, and to look up and down the track; he looked too and saw nothing coming, nor did he hear any thing; heard neither whistle nor bell; would have heard it had it been rung; the first time he knew that the S. P. train was on him, was when he was down in the dump with the mules, and cart; they were not having a joy-ride; the "ladies" were not working that morning; they were just having a little ride; it was a very foggy morning; one could see only about 25 feet off.

Israel Wright recalled to testify concerning his age, says he could not find the red book he mentioned in his examination; he was told by his parents he was 21 and has registered for the army as such; he was nine years old when he came to Willswood and has been there nine years, he is confused about his age.

345

T. S. Landry is the manager of plaintiffs' plantation; has made a sketch of the place where the accident occurred; the first mule was against the sign post 21 feet from the center of the plantation road; the second mule was found at about 55 feet from the center of the same road in the ditch along the railroad track; the cart was in the same spot; the third mule was found on the embankment of the railroad at about 84 feet from the center of the plantation road; they were all lying on the right side of the railroad tracks; when he arrived at the scene of the accident the last coach was about 67 feet from the center of the same road; the limbs and necks of the mules appeared to be broken, but their bodies and their hides were not torn or ruptured, and no other injury was visible; the body of the cart was crushed to pieces; the shafts were torn off; when he first saw Wright he was supported by people and appeared to be hurt; the road is the main road on the plantation and used more frequently then any other, and is most used in November and December; the morning was very foggy and he could not see more than 40 or 50 feet away.

Wright recalled did not state to any employee of the S.P. that he had heard a whistle blow but that he thought it was the T.P. whistle -; the mules were in the center of the track when they were struck, the cart was not quite on top of the track; he did not run into the train; the train ran into him.

A. C. Querella is a railway postal clerk; he was on the mail car behind the engine the morning of the accident; the engineer gave signals at intervals due to the fog; for each crossing he supposes; he heard no bell; he heard a whistle blow, but he could not tell whether it was his train or the T. P.; it was so foggy he could not see anything; he heard a whistle blow before the accident; the train usually makes much noise.

The defendant then examined its witnesses:

Robert B. Tanner was the engineer on the locomotive on the morning of the accident Sunday, November 11th, 1917; he has been an engineer for 34 years;

Q. Were any signals given before coming to that crossing of the approach of the train?

A. There was.

Q. What signal?

A. The road crossing signal, two long blasts of the steam whistle and two short ones; the signals were given at the whistling post about 1700 feet; about 700 feet from that crossing I gave the signal again; the whistle was blown twice.

Q. Did you have a bell on your engine?

A. Yes, sir.

The bell was ringing continuously until this crossing was reached; the fireman attends to that; it is an automatic bell, operated by air; I could hear the bell ringing; the atmosphere was very foggy; he did not see the cart or mules before they were struck; he saw them just at the moment they drove into the front end of the engine into the cylinder; they were struck in the head by the bumper and the cylinder on the right hand side of the engine, and they broke the iron grab handle on the right side of the engine and the step on the right side rear end of the engine; they were struck by the side of the engine; he saw them just as they hit the engine; he got to the crossing before they did; he was not going at a rate of speed exceeding 25 miles; the schedule time is 32 miles an hour; there were seven cars on the train; after the accident he stopped; the rear end of the train was then near the crossing; he walked back to the crossing and had a talk with Israel Wright as follows: "Well, when I got back to the crossing where the boy was standing, I asked him "are you the driver of that wagon; who was driving it? He said: "I was". Mr. Feeney was there, I believe, and this colored man I spoke of; (Ezidore) and I said: "Didn't you hear this train whistle?" He said: "I heard the whistle but I thought it was the T. P. train which just went by?"; the train can be heard coming certainly at least a quarter of a mile; the train was two hours late when he took it at Lafayette; we were due in New Orleans at 7:70 and it was at least 10:30 when we got there; were delayed 30 minutes by the accident; lost time on account of the fog; could see only 15 or 20 feet with the head light; the whistling post is only three or four feet from the end of the tie and he could see it; the train was called the "Sunset Express" and

 .

consisted of the mail and baggage car and sleepers and coaches; the train makes a whole lot of noise when rolling; was not racing with the T. & P.

Charles M. Marxen was fireman on the Southern Pacific train on November 11th, 1917; (the witnesses are now separated) was going about 25 miles an hour; the whistle blew for that crossing at the whistling post; "the bell was ringing a long time before we got to that crossing, because they have got private crossings along there, and they have people going to work along there that time of the morning, and the rule of the company is to ring the bell and blow the whistle for all crossings".; the bell was rung by automatic air; open a valve and ring it; the train makes enough noise for any one to hear it 3 or 400 feet off; the exhaust and the engine; it was very foggy and one could not see beyond ten or fifteen feet; the cylinder was struck and the hand rail was broken off; there was no evidence of hair or anything on the pilot or cow-catcher; the only hair was back of the cylinders; knows nothing about the traffic on that crossing.

John G. Feeney was conductor on the train on the morning of the accident; has been a conductor for eleven years; the morning was foggy; after the train stopped he went back to the crossing and saw Israel Wright; he said his age was 17; he asked him if he did not see the train and he said he thought it was the T. P.; he said he did not hear the whistle blow;

Q. Do you know whether or not the whistle of that train was blown before coming to that crossing?

A. I will swear to it that it was; and the bell was rung also, for the reason that the window where I was sitting in the head coach was open; the bell is operated automatically; it could have been heard 210 feet off from the scene of the accident; he heard the whistle blow from the whistling board; it can be heard much further on a foggy morning when everything is silent and quiet; the morning was foggy and he could not see 50 feet off; according to the telegraph station they ran from Boutte to Willswood, 10 miles, in 31 minutes; a train running 20 or 25 miles on a morning like that, makes much noise; in the woods you could hear it one mile, and out of the woods one half mile, if your mind is on it; when he came back to the crossing

there was no one there except the boy Israel Wright; the train was behind time; they were due to leave Lafayette at 2:48; they left it at 4:10; they lost time between Lafayette and New Orleans; the accident occurred at 8:55; the train was running 20 miles an hour; they reached New Orleans at 10:55; he knows the whistle blew at the whistling board; he looks for the signal boards; that is his business and what he is paid for; his duty is to run the train and look out for those signal boards.

Dr. Rowland F. Thomas, of Cade, La., was a passenger on the train on the morning of the accident, and was seated in the smoker; he heard the whistle blow; the speed of the train was about ten miles an hour; is a graduate of Tulane University and has been practicing for 13 years; after the accident Israel Wright came up the embankment; he heard him talking to the engineer; "he said that he heard the train blow and he thought it was the T. P. because it passed, and as soon as the T. P. passed he drove over the track and the other train hit him, and that the women jumped out of the wagon before the train hit him. He said he stayed in the wagon and tried to get the mules over, or get them off, I don't remember which, and the train turned him and the cart over"; he examined the boy to see if there was any trouble with him. and found a spot on his right side which appeared to be a rupture, but it did not hurt him, and seemed to be an old rupture; he talked freely about the accident and seemed to know how it happened; he is the doctor for the Southern Pacific since 5 years; the engineer blew four times for that crossing, two long ones and two short ones; he does not know which train blew the S. P. or the T. P., but a train did blow.

Alexander Ezidore has been a railway postal clerk for eight years; was on the train on November 11th, 1917;

Q. Well, was any signal given of any kind for that crossing?

A. Yes, sir.

Q. What signal was given?

A. Well, in the first place, the bell was continually ringing, continually; and the whistle was blown also for mile posts, before it reached this crossing; I heard that"; his car was

adjoining the engine; after the accident he and the engineer walked back to the crossing and met there Israel Wright. "We asked him did he hear the whistle blow, and he said yes, but he thought it was the T. P., which runs parallel to the S. P.; the train was then running 15 miles an hour; it was a very foggy morning; he is not employed by the S. P.; he cannot swear positively that the train blew for the crossing, but he can swear positively that she blew before she got to the crossing a few minutes; they were not trying to make up time; they could not.

Nathan Lawson has been express messenger for Wells-Fargo for nearly 23 years; was on the train of the S. P. on the morning of November 11th, 1917; the speed of the train was about 20 or 25 miles;

Q. Well, do you know whether there was any signal given for that crossing that morning?

A. There was a whistle blown, and also the bell rang; that is the customary signal, a minute or a little less before reaching the crossing; the bell was ringing continuously and had been since the first whistle was blown; it was very foggy.

Horatius J. Kennedy, brakeman on the S. P. for 13 years; was flagman on November 11th, 1917;

Q. Do you know whether any signal was given for that crossing or not?

A. Yes, sir, there was a signal given.

Q. Now, state what kind of a signal it was?

A. A steam whistle signal for crossing; two long ones and two shorts.

Q. You are positive that was given for that crossing?

A. Yes, sir, for two crossings; I heard it twice.

Q. You heard it twice, for two crossings?

A. Yes, sir -; the train was going at a speed between 20 and 25 miles; he was sitting on the rear end; back platform; when the train stopped, the hind end step was on the crossing.

J. J. Thrailkill for the last 17 years is a guard for the Wells-Fargo Express on the S. P. road; was on the train the morning of the accident.

Q. Now do you know whether any signal was given for the

crossing at Willswood Plantation?

A. The engineer blew his whistle for the crossing. It was
a very dark morning that morning, and he was blowing his whistle
for the crossing. Of course, I could not see the crossings my-
self, because I was in the baggage car. The engineer could tell
them from where he was, but I could not. He was blowing the
whistle all along these crossings; not more than a minute and a
half and not exceeding two minutes elapsed from the time he blew
the whistle until it stopped;

Q. But you heard the whistle of that train blow before you
got to that crossing?

A. Yes, sir; I was sitting right in the car, and heard the
whistle blow; the train was running 21 or 22 miles an hour; the
train blew for that particular crossing; after it blew he heard
the crash on the same side of the train he was on.

Shepard Smith, train porter on S. P.; was on train on Nov-
ember 11th,; train was running between 18 and 20 miles;

Q. Now do you know whether any signal was given by the engi-
neer, or anybody else prior to this accident?

A. The only signal I know of was the steam whistle was being
blown and the bell was ringing.

Q. Did you hear the whistle blown?

A. Yes, sir;- the bell was constantly ringing; it is *an*
automatic bell; he heard the conductor ask Israel Wright how old
he was, and Wright said he did not know; the conductor asked
Wright if he did not hear the train blow and he said he heard the
whistle blow, out he thought it was the T. P. and that is why he
continued to cross over.

The rule of law is that damages cannot be recovered by
those whose negligence has brought on the injury. It has been
expressed by the words "volenti non fit injuria". 2 H. D.,1054;
48 A., 978; 5 La., Dig., 523 & 25.

In regard to the duty of persons about to cross railroad
tracks the law requires of them to "stop, look, and listen", as
a condition precedent to the right of recovery; in other words,
plaintiff must satisfy the Court, that although he did "stop,
look, and listen", he neither saw nor heard the approaching train
It is not sufficient for a wise plaintiff merely to swear that

351

he "stopped, looked, and listened", and that he neither saw nor heard; but his testimony must be corroborated as a matter of fact by surrounding circumstances establishing that neither plaintiff nor any other person possessed of ordinary sight and hearing, after using those senses in a proper manner could not have seen or heard. If the facts about the case indicate that plaintiff, by the intelligent exercise of his faculties, would have seen and heard, his testimony to the contrary would be of no avail. In the case before the Court it was the duty of the driver of the cart to have stopped at a reasonable distance from the railroad track. He says he stopped ten or fifteen feet from the track. The track was to him a warning, a red light signal, informing him of the danger of crossing. Heavy trains loaded with freight; rapid cars speeding passengers up and down, passed upon these tracks at every moment of the day. He knewmthat; he had lived upon the plantation ten years and had driven carts across the track for almost as many years. After stopping it was his duty to "look and listen"; not in a perfunctory manner, perhaps to comply with the law; but in an effective way to accomplish the end intended by the law in its requirement. 42 A., 355. If the motion of the train was so noiseless that he could not hear it in time to get out of its way, then he could rely only upon his sight; and if the fog was so dense that he could not see beyond twenty feet, then he should not have crossed at all unless he assumed the risk, or he should have walked up the track for a reasonable distance to make sure that no train was coming. But in this case it is not necessary to urge such precaution. We must remember that the plaintiff was driving three mules hitched abreast to a cane cart; their motion was noiseless, slow, and under easy control. Assuming that the driver stopped fifteen feet from the track, and that he proceeded up to the track in a walk at the rate of four miles an hour, and assuming that the train was running at the rate of 40 miles an hour, or ten times faster than the cart, then it is evident that at the moment the cart stabted to cross, the train was ten times further off, or 150 feet, from the point of collision; every foot that the cart advanced put the train ten feet nearer; so that when the cart had gone twelve feet, or within a few feet of the track the train had moved 120 feet, and a distance

352

of only thirty feet separated them. Assuming that the plaintiff could not see the flaming glare of the headlight of the locomotive, it is inconceivable that he could not have heard the noise of the train, at that moment, when it would have been yet time to stop and avert the calamity. This Court will take judicial cognizance of the fact that a locomotive pulling seven pullman and passengers cars at a speed of 25 miles an hour does not make a noise to be heard on a foggy morning in the country at a greater distance than thirty feet. Judicial authority for that statement is not wanting. In the case of Brown vs. RRd., 42 A., 356, the Court said:

"Had he listened as he approached the crossing he would certainly have heard the train as it thundered along in the open field at the rate of thirty miles an hour with no obstruction to sound, and making a noise, which one of the witnesses compares to that made by "a drove of cattle going across a bridge". It is in proof that one of plaintiff's witnesses who was half a mile off, that another who was at a distance of one hundred yards, a third who was 300 yafds off, and a fourth who was a distance of several hundred yards and was walking toward Brown, on the same road and on the opposite side of the track, all waw and heard the train before the accident, and that the attention of one of them was attracted to the train by the noise which it made".

Marxen, defendant's fireman, was asked how much noise a train made running at 25 miles an hour. He answered: "Well, it is enough so that anybody could hear it coming three or four hundred feet off. I guess, the exhaust, engine, and one thing and another".

The engineer said the train could be heard one half mile away.

Feeney, the conductor, says that in the woods you can hear the train coming at one mile; "fully a half a mile, if your mind was on it". Also 42 A., 993. *114 La 828 —*

We therefore conclude that the accident was brough about by the want of care of plaintiffs' driver and for that reason

353

■■■■

they cannot recover. See the case of Gelbke vs. West N, O. RRd.,
No. 7405 recently deceided by us. Also 123 La., 647; 47 A., 270;
6 Ct. App., 238.

Where one of two persons either innocent or mutually
negligent, must suffer, the one who knew of the cause which oc-
casioned the injury, and who could have avoided it and did not
do so must bear the loss. 5 La. Dig., 520 (1882)(1911).

Was the train running at an excessive rate of speed?

There is no evidence that the train was running at a speed
exceeding 25 miles an hour; the schedule speed is 32 miles an
hour. The train was two hours late when it left Lafayette; but
it had not made up time, as it was still two hours late at the
time of the accident; *and* it was more than two hours late when it
reached New Orleans. There is no state or parish law regulating
the speed of railways; it is therefore a question of fact and
not of law; it is left to the discretion of the engineer to be
adjusted by the danger to be incurred. There is no prudence nor
custom that we know of that demands slacking of speed at crossing
plantation roads. *42 a 350 (357) -* The road that crossed the railroad was not a
public road. Plantation roads cross the tracks of the Southern
Pacific, the Texas Pacific and the Mississippi Valley, for many
miles north of New Orleans, and it would be dangerous assumption
of power for Courts to fix the rate of speed at which they will
allow trains to run; neither the Legislature, nor the police
juries have acted and this Court will not. Each case must be
governed by its own features. Nothing in this case proves that
the train was running faster then usual nor faster than it
should. *33 Cyc 971 S 8 - ✓*

But the Judge of the District Court thought that the
train was running too fast on a foggy morning. Rates of speed
from 25 to 50 miles an hour have been approved. 2 Thompson on
Neg. S. 1879.

In 48 A., 937, Vincent vs. Morgan's RRd. our Supreme
Court says:

It has been said in other jurisdictions that
trains must be run with speed on dark nights and on
misty days, and that doing so raises no inference of

354

negligence in the absence of special facts going to call for particular precaution. Quoting 66 N. W., 842. Trains are run by schedule, one train conforming itself to the movements of the others, and it would be a danger-our rule to establish that weather conditions in one particular neighborhood should control and regulate the speed of the trains in a special vicinity".

Did the engineer of the train give signals of his approach by blowing his whistle or ringing his bell?

The Judge of the District Court expressed some doubt upon this point. Four witnesses for the plaintiff swear that none were given. They are: Israel Wright, the driver of the cart, Albert Carter, a brakeman, Gus Joseph, a laborer, and Gould Casimere, who was in the cart with Wright.

On the other hand nine witnesses, *at least* equally credible, swear that the whistle was blown and the bell rung. They are: Tanner, the engineer, and Marxen, the fireman, whose duty it was to blow and ring; Feeney, the conductor, to see that it was done; Dr. Thomas, employed by the defendant; Ezidore, a postal clerk; Lawson, express messenger; Kennedy, brakeman for defendant; Thrailkill, another express messenger; and Smith, the train porter.

Whether the witnesses are counted or weighed the testimony of defendant prevails over that of the plaintiffs.

But the rule of Evidence is that positive testimony must outweigh negative. 1. H. D., 557 No. 12; 2 A., 1008; 12 A., 129; 33 A., 800; 36 A., 84; 37 bA., 258; 40 A., 741; 45 A., 331; 46 A., 570; 47 A., 383; 107 La., 402; 2 Evans Pothier on Oblig p. 190, 452; 30 Am. & Eng. Enc. Law, 1071 *47a 271 - 48a 26 —*

The philosophy of the rule is aptly stated in Story vs. Ins. Co., 37 A., 254 (258): Poche, Judge:

"But, one witness swears affirmatively and the other negatively. The assertion of a fact which has never had existence cannot be consistent with truth, whereas the denial of a fact which has existence may, without violating truth, be the result of inattention or of a defective memory. Hence the rule that positive testimony on a given point, must always predominate over negative testimony on

the same point".

The witnesses to the fact could be indicted for perjury; the others could not.

But in view of our conclusions upon the first branch of this case it is immaterial whether the train ran too fast, or whether the whistle was blown or the bell rung.

"The fact that a railway train approaches a public crossing at a high rate of speed, and also without giving the customary, reasonable, or statutory signals, by ringing its bell, or sounding its whistle, will not excuse contributory negligence on the part of the traveller approaching the crossing, provided his negligence is plain, though it will have an important bearing in the solution of the question whether he was negligent or not". 2 Thompson ≥ 1888 p. 587; 6 Ct. App. 238. *1237-282 320-302 15- 312 492- 42a 350- 442 285- 95 U.S. 697- 33 Cyc 985 § V- 988 § VIII - 1009 § I- 1024(FL)- 1033 § IV- Beach Cont. Neg. Sec 64 p 195- Wharton Neg Sec 384-*

It is therefore ordered that the judgment herein be reversed and avoided and it is now ordered that there be judgment in favor of defendant rejecting plaintiffs' demand at their cost.

May 10th, 1919.

*Judge Dinkelspiel recused takes no part*